**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN OVERSIGHT et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF STATE et al., <br><br> Defendants. | No. 1:19-cv-1773 TNM |

**<u>DEFENDANTS' MEMORANDUM</u>**
**<u>IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

STATUTORY BACKGROUND ....................................................................................... 2

     I.     The Federal Records Act ........................................................................... 3

     II.    The Presidential Records Act ..................................................................... 5

PROCEDURAL HISTORY ............................................................................................. 7

STANDARD OF REVIEW ............................................................................................. 8

ARGUMENT ................................................................................................................. 9

     I.     THE D.C. CIRCUIT HAS CAREFULLY LIMITED THE
           PERMISSIBLE SCOPE OF AN APA CLAIM ALLEGING AN FRA
           VIOLATION .................................................................................................. 9

     II.    PLAINTIFFS' CLAIMS UNDER 5 U.S.C. § 706(1) SHOULD BE
           DISMISSED ............................................................................................... 12

           A.     Plaintiffs Have Not Shown that the Prerequisites to Any
                    § 3106(a) Obligations of the Secretary Are Satisfied .................. 12

                 1.     Plaintiffs Fail To Plausibly Allege that the Interpreter's
                        Notes Are Federal Records ............................................... 13

                 2.     Plaintiffs Fail To Plausibly Allege that Any Removal of
                        the Interpreter's Notes Was Unlawful .............................. 16

                 3.     Plaintiffs Fail To Plausibly Allege that the Secretary
                        Knows an FRA Violation Occurred .................................. 17

           B.     Plaintiffs Have Not Shown that the Prerequisites to Any
                    § 3106(b) Obligations of the Archivist Are Satisfied ................... 22

     III.   PLAINTIFFS' CLAIMS UNDER 5 U.S.C. § 706(2)(A) SHOULD BE
           DISMISSED ............................................................................................... 24

CONCLUSION ............................................................................................................. 24

**TABLE OF AUTHORITIES**

**Cases**

*Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29 (D.C. Cir. 1983) ................................3

*Anglers Conservation Network v. Pritzker*, 809 F.3d 664 (D.C. Cir. 2016) ...................24

*Armstrong v. Bush*, 721 F. Supp. 343 (D.D.C. 1989) ......................................................10

*Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991) .................... *passim*

*Armstrong v. Exec. Office of the President* ("*Armstrong II*"),
    1 F.3d 1274 (D.C. Cir. 1993) ...................................................................2, 4, 6, 10

*Armstrong v. EOP* ("*Armstrong III*"), 90 F.3d 553 (D.C. Cir. 1996) ...............................10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................9, 14, 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................9, 16

*Cause of Action Inst. v. Pompeo*, 319 F. Supp. 3d 230 (D.D.C. 2018) ......................19, 22

*Comcast Corp. v. FCC*, 526 F.3d 763 (D.C. Cir. 2008) ...................................................21

*Competitive Enter. Inst. v. U.S. Envt'l. Prot. Agency* ("*CEI*"),
    67 F. Supp. 3d 23 (D.D.C. 2014) ..............................................................11, 19, 21

*CREW v. Pruitt*, 319 F. Supp. 3d 252 (D.D.C. 2018) ........................................11, 18, 19

*CREW v. SEC*, 858 F. Supp. 2d 51 (D.D.C. 2012) ..........................................................19

*CREW v. Trump*, 302 F. Supp. 3d 127, 137 (D.D.C. 2018),
    *aff'd* 924 F.3d 602 (D.C. Cir. 2019) .......................................................................6

*CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019) ..............................................................6

*CREW v. U.S. Dep't of Homeland Security*,
    527 F. Supp. 2d 101, 110 (D.D.C. 2007) ..............................................................11

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ........................................17

*Ctr. for Biological Diversity v. U.S. Envt'l. Prot. Agency*,
    794 F. Supp. 2d 151 (D.D.C. 2011) .......................................................................12

*Democracy Forward Found. v. White House Office of Am. Innovation*,
    356 F. Supp. 3d 61 (D.D.C. 2019) ........................................................................3

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997) ....................9

*Gawker Media, LLC v. U.S. Dep't of State*, 266 F. Supp. 3d 152 (D.D.C. 2017) ............21

*In re U.S. Office of Personnel Mgmt. Data Security Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019) .............................................................................16

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007) ...........................9

*Judicial Watch, Inc. v. Kerry*, 844 F.3d 952 (D.C. Cir. 2016) .........................9, 12, 19, 22

*Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013) ........................16

*Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033 (D.C. Cir. 2003) .........................9

*Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136 (1980) ....3, 11, 18

*Norton v. SUWA*, 542 U.S. 55 (2004) ..............................................................................12

*PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75 (D.C. Cir. 2018) ....................17

*Price v. U.S. Dep't of Justice*,
    No. 18-cv-1339 (CRC), 2019 WL 2526439 (D.D.C. June 19, 2019) ........... *passim*

*Pub. Citizen v. Carlin*, 184 F.3d 900 (D.C. Cir. 1999) ......................................................3

*Ramirez v. U.S. Immigration & Customs Enf't*, 338 F. Supp. 3d 1 (D.D.C. 2018) ..........24

*United Mine Workers of Am., Int'l Union v. Dye*,
    No. 06-1053, 2006 WL 2460717 (D.D.C. Aug. 23, 2006) ..................................12

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) ..................................17

*Zivotofsky ex rel. Zivotofsy v. Kerry*, 135 S. Ct. 2076 (2015) .........................................17

## **Statutes**

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 ......................................................3

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ...........................................7

5 U.S.C. § 706 ......................................................................................................... *passim*

Federal Records Act ("FRA"),
    44 U.S.C. Chapters 21, 29, 31, and 33 .......................................................... *passim*

44 U.S.C. § 2112 ..............................................................................................7

44 U.S.C. § 2115 ............................................................................................18

Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201–2209 ..............2, 3, 5, 6, 7

44 U.S.C. § 2201 ...........................................................................................2, 3

44 U.S.C. § 2202 ..............................................................................................6

44 U.S.C. § 2203 ........................................................................................5, 6, 7

44 U.S.C. § 2204 ..............................................................................................7

44 U.S.C. § 2904 ..............................................................................................4

44 U.S.C. § 2905 ..........................................................................................5, 23

44 U.S.C. § 3101 ..............................................................................................4

44 U.S.C. § 3102 ..............................................................................................4

44 U.S.C. § 3105 ..............................................................................................4

44 U.S.C. § 3106 ...................................................................................... *passim*

44 U.S.C. § 3301 ..........................................................................................2, 15

## **Regulations**

36 C.F.R. § 1222.10 .........................................................................................4

36 C.F.R. § 1222.12 ..............................................................................4, 5, 14, 15

**INTRODUCTION**

Plaintiffs in this case seek to harness the power of the judiciary to probe the status of a single page or set of pages—the written "notes" of an interpreter, employed by the U.S. Department of State ("State Department"), made during a single meeting between the President and Russian Federation President Vladimir Putin ("Mr. Putin") in July 2017. Invoking the Federal Records Act ("FRA"), Plaintiffs seek to compel the Secretary of State (the "Secretary"), as well as the Archivist of the United States (the "Archivist"), to ask the Attorney General to initiate an action against the President to recover these notes, which the President allegedly took into his possession following the meeting. They do so even though neither the Secretary nor the Archivist has found, acknowledged, or otherwise indicated awareness that the President's alleged action was an unlawful removal of federal records.

Plaintiffs' extraordinary request should be rejected. Nearly three decades ago, in *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991), the D.C. Circuit set forth the limited scope of a court's review of alleged FRA violations. Under *Armstrong*, certain defects in an agency's recordkeeping guideline could be challenged, but individual acts of noncompliance with the guideline could not. Agencies and the Archivist, not courts, are vested with the authority to determine whether a document is a federal record. And although the court did allow claims that an agency head or the Archivist failed to take action required under 44 U.S.C. § 3106—the FRA section Plaintiffs cite here—nothing whatsoever in *Armstrong* or later cases suggests that holding was intended to open the door to an analysis that the court had expressly foreclosed—namely, whether a recordkeeping violation occurred in the first place. Yet here, Plaintiffs ask the Court to do exactly that.

Moreover, Plaintiffs' assertion that the interpreter's notes qualify as a "federal record"

covered by the FRA is itself pure speculation, particularly given the obvious alternative possibility—at least as plausible as Plaintiffs' suggestion—that such notes were never intended to be preserved, but instead consisted only of isolated words, phrases, or symbols jotted down simply to aid the interpreter's short-term memory recall while engaged in the task of interpreting between two languages. Plaintiffs cannot plausibly claim that the President acted unlawfully by allegedly, on a single occasion, taking possession of such notes. Indeed, the President would be well within his discretion in doing so.

## STATUTORY BACKGROUND

Executive branch records are governed by either the FRA, 44 U.S.C. Chapters 21, 29, 31, and 33, or the Presidential Records Act ("PRA"), 44 U.S.C. Chapter 22. As the D.C. Circuit has explained, "[t]he FRA and the PRA apply to distinct categories of documentary materials." *Armstrong v. Exec. Office of the President* ("*Armstrong II*"), 1 F.3d 1274, 1290 (D.C. Cir. 1993). Specifically, the FRA governs "recorded information" that is "made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A).

The PRA, in turn, applies to Presidential records—in other words, materials that are "created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President ("EOP") whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C.

2

§ 2201(2). The PRA expressly excludes from the definition of Presidential records any materials that qualify as "official records of an agency (as defined in [the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(f)[1]])." 44 U.S.C. § 2201(2)(B).[2]

The existence of two separate records regimes—one, under the FRA, governing agencies' federal records, and the other, under the PRA, governing Presidential records—is significant because the two regimes create very different systems of records management, reflecting Congress's concern to avoid encroaching upon the President's authority to manage his own records during his term in office.

## I.   The Federal Records Act

The FRA is "a collection of statutes governing the creation, management, and disposal of records by federal agencies." *Pub. Citizen v. Carlin*, 184 F.3d 900, 902 (D.C. Cir. 1999); *see* 44 U.S.C. §§ 2101-2120, 2901-2911, 3101-3107, 3301-3314. These statutory provisions "establish a unified system for handling the 'life cycle' of federal records—covering their creation, maintenance and use, and eventually their disposal by either destruction or deposit for preservation." *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 36 (D.C. Cir. 1983).

Under the FRA, each agency head is required to "establish and maintain an active,

---

[1] Although the PRA, 44 U.S.C. § 2201(2)(B), refers to subsection (e) of the FOIA, that subsection has been re-codified at 5 U.S.C. § 552(f).

[2] With respect to the EOP, the Supreme Court has recognized that "the President's immediate personal staff" as well as "units in the Executive Office whose sole function is to advise and assist the President" are not included within FOIA's definition of "agency." *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980). For example, the White House Office and the National Security Council ("NSC") are not subject to the FRA. *E.g.*, *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 66 (D.D.C. 2019). Accordingly, there is no overlap; an EOP component is governed either by the PRA or by the FRA, depending on whether that component is within the White House Office, which is categorically excluded from the definition of an agency, or, for components outside the White House Office, whether the component's sole function is to advise and assist the President.

continuing program for the economical and efficient management of the records of the agency."

44 U.S.C. § 3102. The FRA directs that an agency head "make and preserve records containing

adequate and proper documentation of the organization, functions, policies, decisions, procedures,

and essential transactions of the agency and designed to furnish the information necessary to

protect the legal and financial rights of the Government and of persons directly affected by the

agency's activities." 44 U.S.C. § 3101. The FRA further provides, among other things, that agency

heads must "establish safeguards against the removal or loss of records the head of such agency

determines to be necessary and required by regulations of the Archivist." *Id.* § 3105; *see also id.*

§ 2904 (conferring responsibility on the Archivist to "provide guidance and assistance to Federal

agencies with respect to" their records management responsibilities and to promulgate "standards,

procedures, and guidelines with respect to records management"); *see generally Armstrong II*, 1

F.3d at 1278–79 (providing overview of FRA).

Pursuant to the FRA, the Archivist has promulgated regulations at 36 C.F.R. Ch. XII,

Subchapter B. Among other things, the regulations provide guidance on how agencies should apply

the statutory definition of records, and on what types of documentary materials qualify as federal

records. *See* 36 C.F.R. §§ 1222.10, .12. Pursuant to the regulations, "[w]orking files, such as

preliminary drafts and rough notes, and other similar materials, are records that must be maintained

to ensure adequate and proper documentation" only if two criteria are satisfied. *Id.* § 1222.12(c).

First, the drafts or notes must have been "circulated or made available to employees, other than

the creator, for official purposes such as approval, comment, action, recommendation, follow-up,

or to communicate with agency staff about agency business." *Id.* § 1222.12(c)(1). Second, the

drafts or notes must "contain unique information, such as substantive annotations or comments

that adds to a proper understanding of the agency's formulation and execution of basic policies, decisions, actions, or responsibilities." *Id.* § 1222.12(c)(2).

Pursuant to 44 U.S.C. § 3106, "[t]he head of each Federal agency shall notify the Archivist" if the agency head becomes aware of the unlawful removal or destruction of records, "and with the assistance of the Archivist shall initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed from that agency." 44 U.S.C. § 3106(a). The Archivist, in turn, is similarly required to notify the agency head of any unlawful removal or destruction of records and to assist the agency head in initiating action through the Attorney General. *Id.* § 2905. If the agency head "does not initiate an action for such recovery or other redress within a reasonable period of time . . . , or is participating in, or believed to be participating in any such unlawful action, the Archivist shall request the Attorney General to initiate such an action, and shall notify Congress when such a request has been made." *Id.* §§ 2905(a); 3106(b).

## II.     The Presidential Records Act

In contrast to the system of administrative and judicial oversight set forth in the FRA, the PRA's statutory text vests broad authority in the President over recordkeeping during his term in office. The PRA directs the President to take "all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records pursuant to the requirements of this section and other provisions of law." 44 U.S.C. § 2203(a).

In light of this statutory language, the D.C. Circuit recognizes that "the PRA accords the President virtually complete control over his records during his term of office." *Armstrong I*, 924

5

F.2d at 290; *see CREW v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019) ("Although the PRA makes clear that the United States, 'retain[s] complete ownership, possession, and control of Presidential records,' 44 U.S.C. § 2202, it also provides that the President, during his term in office, shall assume 'exclusive[] responsib[ility] for custody, control, and access to such Presidential records.'"). This control encompasses "creation" decisions, as well as "management, and disposal decisions." *Armstrong I*, 924 F.2d at 290. "Thus, the courts may not review any decisions regarding *whether to create* a documentary presidential record." *Armstrong II*, 1 F.3d at 1294 (explaining that "[a] 'creation' decision refers to the determination to *make* a record documenting presidential activities"). Nor may the courts impose limits on "which records to maintain or destroy." *CREW v. Trump*, 302 F. Supp. 3d 127, 137 (D.D.C. 2018), *aff'd* 924 F.3d 602 (D.C. Cir. 2019); *cf. Armstrong II*, 1 F.3d at 1294 (explaining that "[m]anagement decisions' describes the day-to-day process by which presidential records are maintained," and "'disposal decisions' describes the process outlined in 44 U.S.C. § 2203(c)–(e) for disposing of presidential records").

Indeed, unlike the FRA, the PRA contemplates a limited role for the Archivist during a President's time in office, including in connection with the potential destruction of records. During the President's term in office, the President may dispose of records that he determines "no longer have administrative, historical, informational, or evidentiary value," provided that he first obtains the written views of the Archivist of the United States. *Id.* § 2203(c). However, although the Archivist may then "inform Congress of the President's desire to dispose of the records, neither the Archivist nor the Congress has the authority to veto the President's disposal decision." *Armstrong I*, 924 F.2d at 290.

Once a President's time in office has concluded, the Archivist receives the Presidential records and may deposit them in a Presidential archival depository, commonly referred to as a

Presidential library. *See* 44 U.S.C. § 2203(g)(1)–(2). The library, under the direction of the Archivist, must then begin processing and organizing the records to provide for public access. *Id.* Pursuant to the PRA, Presidential records become subject to public request under FOIA five years following the President's final term in office, *see* 44 U.S.C. § 2204(b)(2), but the President may designate certain records as exempt from FOIA for a period of twelve years, *see id.* § 2204(a). Once a President leaves office and his Presidential records have been transferred, the Archivist assumes "responsibility for the custody, control, and preservation of, and access to, the Presidential records of the President." *Id.* § 2203(g); *see also id.* § 2112(c).

## **PROCEDURAL HISTORY**

Plaintiffs filed the instant Complaint on June 18, 2019. [ECF 1.] The Complaint asserts two claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, one against the Secretary and one against the Archivist. Both claims appear to be based on a newspaper story[3] reporting that, after the President met with Russian Federation President Vladimir Putin on July 7, 2017, during the G20 Summit in Hamburg, Germany, the President took possession of the written notes of the State Department interpreter who had provided interpretation services to the President during the meeting and instructed the interpreter not to discuss what had occurred. Compl. ¶ 25 (citing Miller, *supra* n.3). The article also reported that then-Secretary of State Rex Tillerson attended the July 7, 2017 meeting and provided a "readout" of the meeting to others in the Administration. *See id.* ¶ 30; Miller, *supra* n.3. The article did not contain any suggestion regarding what the President was alleged to have done with the notes. *See id.*

---

[3] The article on which Plaintiffs base their claims is Greg Miller, *Trump Has Concealed Details of His Face-to-Face Encounters with Putin from Senior Officials in Administration*, Wash. Post, Jan. 13, 2019, *available at* https://www.washingtonpost.com/world/national-security/trump-has-concealed-details-of-his-face-to-face-encounters-with-putin-from-senior-officials-in-administration/2019/01/12/65f6686c-1434-11e9-b6ad-9cfd62dbb0a8_story.html

After the Miller article was published, Plaintiff American Oversight wrote to Secretary Pompeo, suggesting that the President's alleged "removal" of the interpreter's notes "may violate the Federal Records Act's prohibition on unlawful removal or destruction of federal records. 44 U.S.C. § 3106." Compl. ex.A, at 1. Less than two weeks later, Plaintiff Democracy Forward also wrote to Secretary Pompeo, copying the Archivist Mr. Ferriero, asserting that the President improperly "seize[d]," and possibly destroyed, the interpreter's notes following the July 7, 2017 meeting. Compl. ex. B, at 2. The Democracy Forward letter, like the American Oversight letter, did not point to any other instance of such alleged actions by the President. The Democracy Forward letter requested that the Secretary take enforcement steps in response to these allegations, and further requested that the Archivist take such steps if the Secretary failed to do so. *Id.* at 4. Neither Plaintiff has received a response to its letter. Compl. ¶ 35.

Count One asserts that the Secretary has violated the FRA by failing to report the President's alleged seizure and possible destruction of the interpreter's notes from the July 7, 2017 meeting to the Archivist, and by failing to initiate an enforcement action through the Attorney General to recover those notes. Compl. ¶¶ 45-49. Count Two asserts that the Archivist has violated the FRA by failing to initiate an action through the Attorney General to recover the interpreter's notes from the President. *Id.* ¶ 50. Both Counts seek relief under the APA, 5 U.S.C. § 706(1), which allows claims to "compel agency action unlawfully withheld or unreasonably delayed," and § 706(2)(A), which allows claims to "hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* Compl. ¶¶ 49, 51.

## **STANDARD OF REVIEW**

A motion under Federal Rule 12(b)(6) focuses on "the legal sufficiency of the complaint."

*Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555. A court need not "assume the truth of legal conclusions," *Iqbal*, 556 U.S. at 678, nor "accept inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 555, 557) (alterations in original). Thus, in order to withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The plaintiff's allegations must be sufficiently detailed "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## **ARGUMENT**

## I.      **THE D.C. CIRCUIT HAS CAREFULLY LIMITED THE PERMISSIBLE SCOPE OF AN APA CLAIM ALLEGING AN FRA VIOLATION**

Because the FRA contains no private right of action, any claim alleging an FRA violation must be brought under the APA. *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 954 (D.C. Cir. 2016). However, in light of the broad discretion that the FRA grants agencies in regard to identifying and

handling their own records, and the administrative mechanisms already in place to ensure agencies' FRA compliance, the range of available claims is quite limited. The D.C. Circuit has recognized only two such claims as permissible, while rejecting claims that would insert the judiciary into an agency's day-to-day records management or its decisions regarding the status of a particular document.

First, the court allowed an APA claim that an agency's "recordkeeping guidelines and directives do not adequately describe the material that must be retained as 'records' under the FRA." *Armstrong I*, 924 F.2d at 292. In *Armstrong*, the plaintiffs brought suit when they learned that the outgoing Reagan administration was about to dispose of the contents of an intra-office e-mail system, called PROFS, that was used by NSC and other EOP components. *Armstrong v. Bush*, 721 F. Supp. 343, 347 (D.D.C. 1989). The plaintiffs' FRA challenge alleged that NSC guidelines failed to require the preservation of records that were created or received on that particular system. *See Armstrong I*, 924 F.2d at 286.[4] The D.C. Circuit emphasized that "the FRA understandably leaves the details of records management to the discretion of individual agency heads." *Id.* at 293. Moreover, "agency personnel, not the court, will actually decide whether specific documents— whether they be scraps of paper or PROFS notes—constitute 'records' under the guidelines." *Id.* at 293-94. However, the court held that the plaintiffs' challenge was justiciable because "the only issue a court would be asked to consider" was whether the agency's guidelines were in

---

[4] It should be noted that, at the time of *Armstrong I* and *II*, NSC, the EOP component whose guideline was at issue, considered itself to be subject to the FRA. *See Armstrong* II, 1 F.3d at 1290. In a later decision in the *Armstrong* case, the D.C. Circuit held that the NSC in fact was not governed by the FRA because, as an EOP component with the primary function of advising and assisting the President, it did not qualify as an agency subject to FOIA. *Armstrong v. EOP* ("*Armstrong III*"), 90 F.3d 553, 557, 567 (D.C. Cir. 1996) (describing post-*Armstrong II* Office of Legal Counsel opinion determining that NSC was not a "federal agency," and ultimately holding, consistent with that opinion, that NSC was not an agency subject to FOIA and therefore was not required to comply with the FRA).

"conformity" with statutory directives and "consistent with" NARA regulations. *See id.*

On the other hand, the court in *Armstrong I* held that a challenge to an agency's compliance with its recordkeeping guidelines was impermissible. *Id.* at 294. The court reasoned that the FRA prescribes only one remedy for such acts of noncompliance: "[I]t requires the agency head, in the first instance, and then the Archivist to request that the Attorney General initiate an action to prevent the destruction of documents." *Id.* (citing *Kissinger*, 445 U.S. at 148). Because Congress "decided to rely on administrative enforcement, rather than judicial review at the behest of private litigants, to prevent the destruction or removal of records," the court held that "the FRA precludes judicial review of such actions." *Id.* at 294-95; *see also Competitive Enter. Inst. v. U.S. Envt'l. Prot. Agency* ("*CEI*"), 67 F. Supp. 3d 23, 32 (D.D.C. 2014) ("*Armstrong I* distinguished between reviewable challenges to an agency's recordkeeping guidelines under the APA, and unreviewable challenges to the agency's day-to-day implementation of its guidelines."); *CREW v. U.S. Dep't of Homeland Sec.*, 527 F. Supp. 2d 101, 111 (D.D.C. 2007) ("Given the firm language in *Armstrong I*, CREW is precluded from suing the DHS to enjoin the agency from acting in contravention of its own recordkeeping guidelines or the FRA." (citation omitted)); *CREW v. Pruitt*, 319 F. Supp. 3d 252, 260 (D.D.C. 2018) (plaintiffs "may not demand judicial review of isolated acts allegedly in violation of [the FRA]").

The second type of FRA claim permitted by the court in *Armstrong I* was thus a far narrower one. The court held that a plaintiff could seek "judicial review of the agency head's or Archivist's refusal to seek the initiation of an enforcement action by the Attorney General" under 44 U.S.C. § 3106. *Armstrong I*, 924 F.2d at 295; *cf. Pruitt*, 319 F. Supp. 3d at 258.

\* \* \* \*

Plaintiffs are attempting to fit both their claims—Count One, against the Secretary, and

Count Two, against the Archivist—under the second type of claim that was recognized as permissible in *Armstrong I*. For each of those claims, they seek to assert alternative causes of action under § 706(1) and (2)(A). However, as set forth in detail below, none of Plaintiffs' claims are cognizable. With respect to their § 706(1) claims, Plaintiffs fail to plausibly allege that either the Secretary or the Archivist was required to take action under § 3106 where there is no plausible basis to conclude that the interpreter's notes qualify as federal records under the FRA, nor that either the Secretary or the Archivist knows or has reason to believe that the President unlawfully removed State Department records from the agency. And with respect to their § 706(2)(A) claims, Plaintiffs fail to identify a final agency action as the subject of their challenge.

## II.    PLAINTIFFS' CLAIMS UNDER 5 U.S.C. § 706(1) SHOULD BE DISMISSED

As the Supreme Court has explained, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. SUWA*, 542 U.S. 55, 64 (2004) (emphasis in original)); *see Judicial Watch, Inc.*, 844 F.3d at 954. This standard applies whether a plaintiff alleges an unlawful withholding or an unreasonable delay. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Envt'l. Prot. Agency*, 794 F. Supp. 2d 151, 157 (D.D.C. 2011) ("[A]n unreasonable-delay claim requires that the agency has a duty to act in the first place."); *United Mine Workers of Am., Int'l Union v. Dye*, No. 06-1053, 2006 WL 2460717, at *9 (D.D.C. Aug. 23, 2006) ("[E]ven in the context of an unreasonable delay claim, a plaintiff still must establish a clear duty to act under the relevant statute."). Here, Plaintiffs' claims under § 706(1) should be dismissed because they fail to plausibly allege that the FRA requires the actions they seek to compel.

### A.    Plaintiffs Have Not Shown that the Prerequisites to Any § 3106(a) Obligations of the Secretary Are Satisfied

Plaintiffs assert that the Secretary was required to take action under 44 U.S.C. § 3106(a),

first to "recover" the interpreter's notes, second to "notify" the Archivist that FRA violations had

occurred, and third to "initiate an action through the Attorney General to recover" the notes.

Compl. ¶¶ 46-48. However, under the plain language of § 3106(a)[5], an agency head is not required

to act unless (1) the documents at issue are federal "records in the custody of the agency"; (2) those

records were removed, and (3) the agency head "knows or has reason to believe" such removal

occurred and was unlawful. 44 U.S.C. § 3106(a); *cf. Price v. U.S. Dep't of Justice*, No. 18-cv-1339

(CRC), 2019 WL 2526439, at *6 (D.D.C. June 19, 2019) (requiring plaintiff raising similar claim

to "(1) identify records that fall under the FRA; (2) allege that those records are being removed or

destroyed in violation of the FRA; and (3) allege that the relevant agency head . . . and/or Archivist

knew about the FRA violations and  yet failed to initiate corrective action"). None of these

prerequisites are met here.

## 1. Plaintiffs Fail To Plausibly Allege that the Interpreter's Notes Are Federal Records

First, Plaintiffs fail to plausibly assert that the interpreter's written notes are federal records

in the custody of the State Department. Plaintiffs allege, based on second-hand reporting, that the

President took possession of certain "written notes" of a State Department employee, whom they

allege was "serving in his or her official capacity as an Office of Language Services employee,"

Compl. ¶¶ 25-28—in other words, as an interpreter—during a meeting between the President and

---

[5] Section 3106(a) provides that:

> The head of each Federal agency shall notify the Archivist of any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records in the custody of the agency, and with the assistance of the Archivist shall initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed from that agency, or from another Federal agency whose records have been transferred to the legal custody of that Federal agency.

44 U.S.C. § 3106(a).

Mr. Putin in July 2017.[6]

But Plaintiffs assert no facts that plausibly suggest that any such notes, when jotted down by the interpreter while performing the task of interpretation, qualified as "federal records" covered by the FRA. *See Iqbal*, 556 U.S. at 678 (in order to be plausible, factual allegations must suggest more than a "sheer possibility that a defendant acted unlawfully"). Instead, the only supporting detail they provide is that the Office of Language Services makes arrangements for interpreters. Compl. ¶ 27. Nothing in the description that Plaintiffs provide of such arrangements, detailed in paragraph 27 of their Complaint, suggests that interpreters have any responsibility for creating records of meetings where they are serving as interpreters. Yet Plaintiffs allege, with no factual support whatsoever, that the notes at issue "document[ed]" the President's meeting. Compl. ¶¶ 25, 28. The generic statement that Plaintiffs cite from the State Department's Foreign Affairs Handbook ("FAH"), *see id.* ¶ 26, also fails to support their allegation. That statement simply requires agency-wide preservation of materials that do qualify as federal records in accord with records disposition schedules, but nowhere suggests that any and all written notes interpreters make while serving as interpreters "document" meetings or qualify as federal records. *See* 5 FAH 4 H-113.[7]

Moreover, Plaintiffs make no attempt to fit the interpreter's so-called "notes" within the rubric of the NARA regulation governing "rough notes." *See* 36 C.F.R. § 1222.12(c). Under that regulation, the first requirement for such notes to be federal records is that they be "circulated or

---

[6] Plaintiffs make no attempt to extend their claim beyond the single occurrence in July 2017, and for good reason. The same *Washington Post* article that originally reported the allegation regarding the interpreter's notes in that instance—which appears to be the sole basis for Plaintiffs' claims here—acknowledged that it had no information on "whether Trump has taken notes from interpreters on other occasions." *See* Miller, *supra* n.3.

[7] The State Department's Foreign Affairs Manual and Foreign Affairs Handbook are available at https://fam.state.gov/search.

made available" to other agency employees "for official purposes." *See id.* § 1222.12(c)(1). But Plaintiffs have not alleged that such circulation took place, or even that the interpreter intended to circulate the notes to other State Department employees, and they in fact allege that the President took the notes after the meeting ended, suggesting that the interpreter did *not* circulate them before they were allegedly taken. The import of § 1222.12(c) is that an agency employee's "notes" could only qualify as federal records if they were preliminary or rough notes made in contemplation of producing a final product, and those notes were actually used, not just by the employee who made the notes in the first place, but in communication with other agency employees, in the agency's deliberative process. But Plaintiffs' allegations support no such role for the notes at issue.

In addition, Plaintiffs' bare and bald allegation that the notes "document[ed]" the meeting is insufficient to establish the plausibility of their alleged "federal records" status when there is an obvious alternative possibility—that the notes might be to aid the interpreter's own short-term memory as needed—for example, for certain complex words or phrases—while performing the challenging task of real-time language interpretation. Such notes would not be of "informational value," nor would they otherwise meet the definition of "record" for purposes of the FRA, as set forth in 44 U.S.C. § 3301(a)(1)(A) or, as applicable to "rough notes," the criteria set forth in 36 C.F.R. § 1222.12(c)(2) (requiring that the notes "contain unique information, such as substantive annotation or comments that adds to a proper understanding of the agency's formulation and execution of basic policies, decisions, actions, or responsibilities"). This alternative possibility— that an interpreter's written notes are simply a real-time tool the interpreter uses while engaged in the immediate task of oral interpretation, not intended to record the event where the interpreter is engaged, or to be shared as part of any deliberative agency process—is not only the more obvious one, but is also entirely incompatible with the notion that such notes would instead reflect an

interpreter's attempt, even while immersed in the ongoing task of interpreting, to "document" the meeting itself. The existence of a more obvious, incompatible possibility defeats the plausibility of Plaintiffs' assertions. *See In re U.S. Office of Personnel Mgmt. Data Security Breach Litig.*, 928 F.3d 42, 57 (D.C. Cir. 2019) (observing that, in both *Iqbal* and *Twombly*, the Court rejected the plausibility of the plaintiffs' assertions in part because an alternative, more obvious explanation was incompatible with the plaintiffs' suggestion).

### 2.     Plaintiffs Fail To Plausibly Allege that Any Removal of the Interpreter's Notes Was Unlawful

Second, in the absence of any plausible allegation that the interpreter's notes qualify as federal records governed by the FRA, Plaintiffs' further allegation that the President took possession of such notes, even if assumed to be true, does not suggest that anything unlawful occurred. Indeed, to the extent such notes were intended to assist anyone other than the interpreter, it would clearly be the President, as the one conducting the meeting and for whom the interpretation service was provided, who retains an interest in the notes, as well as the authority to use them as he deemed appropriate, rather than the State Department.

In *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013), the court held that Secret Service logs of visitors to the President and other non-agency White House components were not agency records within the meaning of FOIA, among other reasons because the President could not reasonably be forced to "surrender [his] constitutional prerogative of maintaining secrecy regarding his choice of visitors (and therefore of outside advisors), or to decline to cooperate with the executive branch agency entrusted with (and necessary for) his personal protection." *Id.* at 221 (internal quotation omitted)).

In the context of meetings with foreign leaders, the President should similarly not be forced to forego control over the content of such meetings as a condition of obtaining the necessary

assistance of a State Department interpreter. The Constitution vests "plenary and exclusive power" in the President to act "as the sole organ of the federal government" in many areas of international relations. *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (recognizing the President's exclusive authority to negotiate treaties); *cf. Zivotofsky ex rel. Zivotofsy v. Kerry*, 135 S. Ct. 2076, 2086 (2015) (recognizing the President's exclusive authority to recognize foreign governments because on such matters, "the Nation must 'speak . . . with one voice,'" and "[t]hat voice must be the President's" (internal quotation and citation omitted)); *see also PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 107 (D.C. Cir. 2018) ("'The President has broad authority in the field of foreign affairs.'"). The President's authority in this area necessarily encompasses the power "to speak and bargain effectively with other nations." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 382 (2000). It is thus up to the President to decide how best to negotiate with other countries, and who should be present in meetings with foreign leaders. Any interpretation of the FRA that would limit the President's authority in this key area would encroach on the very Article II powers that prior cases have expressly recognized. Plaintiffs' allegation that the President acted unlawfully by taking possession of the interpreter's notes, made during the July 7, 2017 meeting between the President and Mr. Putin, is therefore implausible on its face.

### 3. Plaintiffs Fail To Plausibly Allege that the Secretary Knows an FRA Violation Occurred

Third, Plaintiffs also fail to plausibly allege that the Secretary "knows or has reason to believe" that the President unlawfully removed federal records from State Department custody. In *Price*, Judge Cooper provided a well-reasoned analysis of the "knowledge" requirement in § 3106. *Price*, 2019 WL 2526439, at *11-13. As the court explained, "merely alleging an FRA violation by itself will not suffice" to meet the knowledge requirement, nor does a plaintiff's "own, unilateral allegation of an FRA violation"—even when made in a letter to the Secretary. *Id.* If it were

otherwise, the D.C. Circuit in *Armstrong* would have "wasted its breath when it prohibited private actions 'to prevent an agency official from improperly destroying or removing records'" because "a plaintiff could secure judicial review for that very claim simply by adding the further demand that an agency head or the Archivist initiate action to recover the allegedly missing records." *Id.* at *13 (quoting *Armstrong I*, 924 F.2d at 294). Federal courts would then have to "decide whether an FRA violation has occurred in the first instance—a question not just the D.C. Circuit, but also the Supreme Court has said is unfit for judicial review." *Id.* (citing *Kissinger*, 445 U.S. at 149-50).

Rather than a mere allegation by the plaintiff, the court in *Price* thus required that the plaintiff plausibly allege that the agency has already *found* that federal records have been unlawfully removed from the agency's custody. *See id.* at *14 (rejecting the plaintiff's claim because "[h]e has not plausibly alleged that either the Attorney General or the Archivist found an actual, threatened, or impending unlawful removal or destruction of records," but instead only alleged that *he* provided notice to the agency and Archivist in his communications to them). In *Pruitt*, Judge Boasberg similarly held that "[t]he finding of a violation is thus a condition precedent to the Archivist's statutory obligation to act" under 44 U.S.C. § 2115, another FRA provision that requires the Archivist, upon finding an FRA violation, to inform the relevant agency of the violation and make recommendations for its correction. *See Pruitt*, 319 F. Supp. 3d at 261. The court thus rejected the plaintiff's claim in that case because its "failure to allege that the Archivist made any actual finding of a violation . . . is fatal" to its claim. *Id.* at 262.[8]

---

[8] While there are textual differences between § 2115 and § 3106, the same reasoning compels the conclusion that an actual finding by the agency is required in both instances. As the court in *Price* explained, Congress could not have intended the "peculiar statutory scheme" that would result if a plaintiff bears a lower burden when seeking to invoke § 3106's obligation to initiate judicial action than when merely seeking to invoke § 2115's obligation to notify the agency and provide recommendations. *See Price*, 2019 WL 2526439, at *12. The court thus concluded, "[a]s it was with § 2115, so it should be with § 3106: '[t]he finding of a violation is . . . a condition precedent

The Court here should follow the reasoning of *Price* and *Pruitt* and dismiss Plaintiffs' claim against the Secretary absent an agency finding that an FRA violation occurred. It would be particularly inappropriate in this case to impute awareness of an FRA violation to the Secretary absent a clear finding or acknowledgement on his part. The situation here—involving a single occasion where the President allegedly took possession of an interpreter's notes made during a single meeting where the interpreter was assigned to serve as the President's interpreter—is quite different from that in *CEI*, where the plaintiff sought to compel EPA to notify the Archivist when its employees were admittedly using their work smart phones to send work-related text messages. *See CEI*, 67 F. Supp. 3d at 34. There, the plaintiff was able to point to information suggesting that high-level EPA employees had sent or received thousands of text messages, while the agency had provided "no records" responses to FOIA requests seeking text messages. *Id.* at 28-29. The court held that it was "implausible that EPA Administrators would not have suspected the destruction of any federal records with the removal of over 5,000 Agency text messages." *Id.*[9] Here, on the

---

to the [agency head's and] Archivist's statutory obligation to act.'" *Id.* (quoting *Pruitt*, 319 F. Supp. 3d at 261) (last alteration revised).

[9] Strikingly, most other cases where plaintiffs have sought to compel the agency head or Archivist to initiate enforcement action have also, like *CEI*, involved significant periods of time during which either a high-profile agency employee or significant numbers of agency employees were using a particular, often new, technology. *See Armstrong I*, 924 F.2d at 286 (PROFS intra-agency email); *Judicial Watch, Inc*., 844 F.3d at 954 (Secretary's use of a private e-mail server); *Cause of Action Inst. v. Pompeo*, 319 F. Supp. 3d 230, 232 (D.D.C. 2018) (Secretary's use of a private e-mail account); *Price*, 2019 WL 2526439, at *6 (federal agencies' use of Child Protection System software program allowing searches of peer-to-peer networks for certain "hash values" that identified child pornography). In at least some of those cases, the agency's records management policies simply may not have kept up with the technology. In *CREW v. SEC*, 858 F. Supp. 2d 51, 56 (D.D.C. 2012), the records at issue were not created by a particular technology but they did comprise an entire category of records—those relating to "the preliminary work that the SEC undertakes prior to the commencement of a formal investigation"—that the agency allegedly had not been preserving for a significant period of time because its policy required the destruction of such records. All of those cases are distinct from the case here, involving one interpreter's written

other hand, the implausibility is all on Plaintiffs' side. Moreover, to allow Plaintiffs to proceed with their claim against the Secretary based merely on the supposition that an interpreter's notes from a specific meeting met the criteria for a federal record before they were allegedly taken by the President would allow the very circumvention of *Armstrong* that the court in *Price* sought to avoid; the Court would be called upon to determine whether those particular notes qualify as a federal record. But "agency personnel, not the court, [are supposed to] actually decide whether specific documents . . . constitute 'records.'" *Armstrong I*, 924 F.2d at 293-94.

Plaintiffs therefore fail to plausibly assert knowledge on the Secretary's part because they identify no agency finding that an FRA violation occurred. But even if a clear finding were not required, Plaintiffs' claim of knowledge would remain implausible. Plaintiffs first rely on the Miller newspaper article as reporting that then-Secretary Tillerson was present at the July 7, 2017 meeting. They conclude from Secretary Tillerson's mere presence at the meeting that he "would have had direct knowledge of the events" that Plaintiffs claim gave rise to an FRA violation—but as described by Plaintiffs, the President took possession of the interpreter's notes after the meeting had ended. Compl. ¶¶ 25, 30. And even assuming that then-Secretary Tillerson was present when the President allegedly took possession of the interpreter's notes and was aware that the President did so—conclusions that by no means follow from the fact that the former Secretary was present at the meeting itself—that does not suggest that the former Secretary knew, or found, that a FRA violation had occurred. To the contrary, those facts would equally, if not more, plausibly support the notion that the interpreter's notes were not federal records at all, and that then-Secretary Tillerson therefore had no concern about the President taking possession of the notes.

---

notes from one specific interpretation assignment, where Plaintiffs have failed to plausibly allege that the notes even qualify as federal records.

Indeed, Plaintiffs' allegation that the interpreter handed over the notes to the President also suggests that it was lawful for the interpreter to do so. After all, the State Department's Foreign Affairs Manual ("FAM") places responsibility on "every Department of State employee" to "create and preserve records that properly and adequately document the organization, functions, policies, decisions, procedures, and essential transactions of the Department." 5 FAM 422.3; *cf. Gawker Media, LLC v. U.S. Dep't of State*, 266 F. Supp. 3d 152, 160 (D.D.C. 2017) ("State has policies that require individual employees to determine whether a document . . . qualifies as a federal record that must be retained, or is instead a non-federal record that need not be retained."). The D.C. Circuit "requires courts to apply the . . . presumption[] . . . that government officials discharge their duties in good faith." *CEI*, 67 F. Supp. 3d at 33 (citing *Comcast Corp. v. FCC*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008)). Plaintiffs allege no facts that suggest that the interpreter would have willfully violated State Department policy during the July 7, 2017 meeting.[10]

Plaintiffs also seek to rely on the letters that they sent to the Secretary. Compl. ¶¶ 31-34. However, the letters themselves are equally devoid of any plausible basis to conclude that the notes are federal records; instead, they rely on the same newspaper accounts cited in the Complaint itself. *See* Compl. exs. A-B. As Plaintiffs concede, the Secretary did not respond to the letters or otherwise indicate his agreement or acknowledgement that any FRA violations had occurred. *See id.* ¶ 35. Nor is there any indication in the record that the State Department took any "steps toward correcting for the removal of the records at issue" that could serve "as an acknowledgement that those records should be in the agency's possession." *Price*, 2019 WL 2526439, at *14 (contrasting

---

[10] Of course, as explained above the question of whether the interpreter violated the State Department's records policy in this instance is beyond the scope of permissible judicial review. *Armstrong I*, 924 F.2d at 294; *CEI*, 67 F. Supp. 3d at 32.

the case there from those in *Judicial Watch, Inc.*, 844 F.3d at 953, and *Cause of Action Inst.*, 319 F. Supp. 3d at 233, where such steps had been taken). For the same reasons explained by the court in *Price*, Plaintiffs' own letters are plainly insufficient to establish the Secretary's knowledge of an unlawful removal of agency records from State Department custody. Plaintiffs' § 706(1) claim against the Secretary therefore should be dismissed.

### B.     Plaintiffs Have Not Shown that the Prerequisites to Any § 3106(b) Obligations of the Archivist Are Satisfied

Similar to their claim against the Secretary, Plaintiffs also assert that the Archivist was required to take action under § 3106(b) to "initiate a recovery action through the Attorney General" when the Secretary failed to do so. Compl. ¶ 50. Pursuant to § 3106(b),[11] such a claim again requires Plaintiffs to plausibly allege (1) that the documents at issue are federal "records in the custody of the agency"; and (2) that those records were removed. For the same reasons explained above, Plaintiffs fail to satisfy these first two prerequisites to a § 706(2) claim against the Archivist.

Section 3106(b) further requires a plausible allegation that (3) the Archivist failed to ask the Attorney General to initiate a recovery action as required by § 3106(b). But the text of § 3106(b) suggests that any obligation of the Archivist to initiate a recovery action can only arise if the Archivist is first notified by the agency head of an actual, impending, or threatened unlawful removal of federal records from the agency's custody, and only after a reasonable period of time has passed without the agency head himself proceeding, with the assistance of the Archivist, to

---

[11] Section 3106(b) provides that:

    In any case in which the head of a Federal agency does not initiate an action for such recovery or other redress within a reasonable period of time after being notified of any such unlawful action described in subsection (a), or is participating, or believed to be participating in any such unlawful action, the Archivist shall request the Attorney General to initiate such an action, and shall notify the Congress when such a request has been made.
44 U.S.C. § 3106(b).

initiate a recovery action. *See* 44 U.S.C. § 3106(b) (indicating that its requirement applies only after "a reasonable period of time after [the Archivist has been] notified of any unlawful action described in subsection (a)"). Here, Plaintiffs concede that the Secretary has never notified the Archivist of an unlawful removal; indeed, they seek to compel the Secretary to do so through this action. Their claim against the Archivist fails for that reason alone.

Moreover, to the extent § 3106(b) could be construed to impose an obligation on the Archivist without the agency head's notification, the same reasoning above, with respect to the Secretary's lack of knowledge, applies here as well.[12] There is no plausible allegation here that the Archivist made a finding of unlawful removal. Plaintiffs again seek to rely on Democracy Forward's own letter to the Secretary, copying the Archivist. However, a letter from a private party is even less likely to confer knowledge on the Archivist regarding an unlawful removal of federal records from another agency than it is to confer such knowledge on the head of the agency in question. Common sense suggests that, at a minimum, the Archivist would have to make some inquiry of the agency before drawing a conclusion. As Plaintiffs concede, however, the Archivist has not responded to their letter, so they have no basis to suggest that the Archivist made such an inquiry, or what the results of any such inquiry might have been. If anything, Plaintiffs' allegation that the Archivist has not responded to their letter suggests that the Archivist failed to identify a legitimate reason to take further action. In any event, Plaintiffs' failure to make plausible allegations that either the Secretary or the Archivist were required to take the actions they seek to compel dooms their claims under § 706(1), and those claims should be dismissed.

---

[12] Plaintiffs' Complaint does not cite 44 U.S.C. § 2905, so their Count Two cannot be read to claim a violation of that statute. However, to the extent Count Two is construed to assert a violation of § 2905, the same argument set forth above would apply. The section should not be construed to impose obligations on the Archivist absent a finding by the Archivist that an FRA violation has occurred.

## III.    PLAINTIFFS' CLAIMS UNDER 5 U.S.C. § 706(2)(A) SHOULD BE DISMISSED

Plaintiffs also seek to raise under § 706(2)(A) the same claims that they raise against the Secretary and the Archivist under § 706(1). However, any claim brought under § 706(2) must challenge a "final agency action" that has already occurred. *Cf. Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 669 (D.C. Cir. 2016); *see also Ramirez v. U.S. Immigration & Customs Enf't*, 338 F. Supp. 3d 1, 40 (D.D.C. 2018) ("Even discrete agency actions are reviewable by a court under the APA only if they *are*" (not "will" or "would be") "final." (emphasis added) (citing 5 U.S.C. § 704). Plaintiffs' claims here focus solely on actions that, they allege, have *not* occurred—hence, their claims under § 706(1) to compel them. The "final agency action" requirement is therefore not satisfied for their claims under § 706(2)(A), and those claims should also be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims in their entirety, with prejudice.

Dated:  September 20, 2019                    Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
MARCIA BERMAN
Assistant Director, Federal Programs Branch

*/s/ Kathryn L. Wyer*
KATHRYN L. WYER
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Washington, DC  20005
Tel. (202) 616-8475 / Fax (202) 616-8470
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*