## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**DEMOCRACY FORWARD FOUNDATION**, *et al.*,

Plaintiffs,

v.

**MICHAEL R. POMPEO, in his official capacity as U.S. Secretary of State**, *et al.*,

Defendants.

---

Case No. 1:19-cv-01773 (TNM)

## <u>MEMORANDUM OPINION</u>

Much like Hamilton, Jefferson, and Madison's dinner that led to the Compromise of 1790, "no one else was in the room where it happened" when President Trump and then-Secretary of State Rex Tillerson met with their Russian counterparts during the 2017 G20 Summit. *See* Lin-Manuel Miranda, *The Room Where It Happens*, *on* Hamilton:  An American Musical (Atl. Records 2015).  That is, except their interpreters.  Plaintiffs want to know what happened during that meeting.  So they have turned to the President's interpreter, arguing that the U.S. Department of State had an obligation to preserve his notes under the Federal Records Act ("FRA").  Because the Court disagrees with Plaintiffs' base premise—that these jottings were federal records—it grants summary judgment for the Government.

## I.

According to some newspaper articles, President Trump held a sideline meeting with Russian President Vladimir Putin during the 2017 G20 Summit in Hamburg, Germany.  *See* Pls.' Cross-Mot. Summ. J. ("Pls.' Mot."), Ex. A-1 ("Miller Article") at 5, ECF No. 18-2;  Pls.' Mot.,

Ex. A-2 ("Baker Article") at 18, ECF No. 18-2.[1]  Then-Secretary of State Rex Tillerson, the

Russian foreign minister, and two interpreters also attended.  *See* Baker Article at 18.  Following

the meeting, the President allegedly asked the State Department interpreter, Yuri Shkeyrov, to

give him his interpreting notes.  *See* Miller Article at 5; Baker Article at 17.  Shkeyrov complied.

*See* Miller Article at 5; Baker Article at 17.

A year and a half later, the *Washington Post* broke the story.  *See* Miller Article at 5–15;

Baker Article at 17–18.  "President Trump has gone to extraordinary lengths to conceal details of

his conversations with Russian President Vladimir Putin," it claimed, "including on at least one

occasion taking possession of the notes of his own interpreter and instructing the linguist not to

discuss what had transpired with other administration officials[.]"  Miller Article at 5.

These articles set off two series of actions.  First, they alerted two nonprofit

organizations—Plaintiffs Democracy Forward Foundation and American Oversight (collectively,

"Democracy Forward" or "the Organizations")—to the possibility that the President's alleged

action violated the FRA.  *See* Pls.' Mot. at 13.  Shkeyrov's notes, they believed, were likely

federal records.  *Id*.  And the President, by seizing them, unlawfully removed those records.  *Id.*

So they sent letters to the Secretary of State ("the Secretary"), copying the National Archivist

("the Archivist").  *Id.*; Compl. Exs. A & B, ECF Nos. 1-1, 1-2.  The Organizations notified the

Secretary of the potential FRA violation and asked him to take administrative action to recover

Shkeyrov's notes.  Pls.' Mot. at 13; Compl. Exs. A & B, ECF Nos. 1-1, 1-2.  He never

responded.  Pls.' Mot. at 13.

Second, the *Washington Post* articles prompted Timothy Kootz, the Division Chief of the

Records Archives Management Division and the Agency Records Officer of the State

---

[1] All page citations are to the page numbers generated by the Court's CM/ECF system.

Department, to investigate.  A.R. at 6, ECF No. 15.  He instructed his staff to speak with the

Department's Office of Language Services to "collect information that would allow [him] to

determine whether State Department interpreters' notes would qualify as federal records."  *Id.*

After discussing his findings with the National Archives and Records Administration ("NARA"),

he concluded that "any written material generated by the [] interpreter . . . was not a federal

record."  *Id.*  So the State Department never tried to recover Shkeyrov's notes.  *Id.*

 Democracy Forward disagrees with Kootz's conclusion.  It maintains that these notes are

federal records that cannot be removed or destroyed without adhering to the State Department

and NARA's guidelines.  Pls.' Mot. at 8.  And it sued the State Department, NARA, the

Secretary, and the Archivist (collectively, "the Government") to try to force the Secretary and

Archivist to initiate administrative action to recover Shkeyrov's notes.  *See* Compl., ECF No. 1.

The Government promptly moved to dismiss the case.  Defs.' Mot. to Dismiss, ECF No.

9.  But the Court denied that motion, finding that at that early stage, Democracy Forward had

"made sufficient factual allegations about the notes and the Secretary and Archivist's awareness

of the events to survive the Government's motion to dismiss."  Mot. H'ring Tr. at 46:10–13

(Dec. 11, 2019), ECF No. 23.

Following that ruling, the Secretary and Archivist compiled and submitted an

administrative record explaining the Secretary and Archivist's reasons for not trying to recover

Shkeyrov's notes.  *See* Notice of Filing of the A.R., ECF No. 15.  This record contained

declarations from State Department and NARA officials and the Blanket Purchase Agreement

for interpreter contractors for the Department's Office of Language Services.  *See* Index of A.R.,

ECF No. 15-1.

The parties have each moved for summary judgment. *See* Defs.' Mot. Summ. J., ECF No. 16; Pls.' Mot. Based on the administrative record, the Court now agrees with the Government that Shkeyrov's notes are not federal records. The Secretary and Archivist thus did not need to pursue recovery of the notes, nor was their decision to forgo administrative action arbitrary and capricious. So the Court will deny summary judgment for Democracy Forward and grant it for the Government.[2]

## II.

Democracy Forward advances claims under Section 706(1) and (2) of the Administrative Procedure Act ("APA"). *See* Pls.' Mot. at 17, 33. Normally, a court will grant summary judgment when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). But courts play a different role in APA cases.

When a court reviews final agency action under Section 706(2), summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89–90 (D.D.C. 2006) (citing *Richard v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)). A court will invalidate the agency's action only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Though a court's review of agency action under the arbitrary and capricious standard is "narrow," it must determine whether the agency "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection

---

[2] The Court has jurisdiction over this case under 28 U.S.C. § 1331 because this action arises under federal law—specifically the APA, 5 U.S.C. §§ 701, *et seq.*, the FRA, 44 U.S.C. §§ 3301, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

Review of "an agency's *inaction* . . . is still more limited." *Citizens for Respons. & Ethics v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013) (emphasis added). Under Section 706(1), a court may "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). This section of the APA "carried forward the traditional practice . . . of writs of mandamus" which allowed "enforcement of a specific, unequivocal command . . . of a precise definite act about which an official had no discretion whatever." *Norton v. SUWA*, 542 U.S. 55, 63 (2004) (cleaned up). So Section 706(1) only empowers a court to compel "discrete" agency action where an agency is "required" by law to act. *Id*. at 64.

## III.

### A.

The Federal Records Act requires agencies to "make and preserve records containing adequate and proper documentation" of the agencies' activities and to establish records management programs to ensure proper maintenance of federal records. *See* 44 U.S.C. §§ 3101, 3102(1).

Yet not every scrap of paper lying about a bureaucrat's desk qualifies as a "record." *See Armstrong v. Exec. Office of the President* ("*Armstrong II*"), 1 F.3d 1274, 1287 (D.C. Cir. 1993). Records are limited to "recorded information, regardless of form or characteristics," that are (1) "made or received by a Federal agency under Federal law or in connection with the transaction of public business"; *and* (2) "preserved or appropriate for preservation by that agency . . . as evidence of the organization, functions, policies, decisions, procedures, operations, or

5

other activities of the United States Government or because of the informational value of data in them."  44 U.S.C. § 3301(a)(1)(A).

This definition provides sparse guidance for agency employees who make day-to-day calls about whether they can toss something into the shred bin.  After all, how does someone determine whether a document is "appropriate for preservation . . . because of the informational value of data" in a document?  To help, Congress instructed the Archivist to promulgate regulations elaborating on Congress's definition.  *See id*. § 2904(c)(1).   Under the FRA, "[t]he Archivist's determination whether recorded information . . . is a record . . .  shall be binding on all Federal agencies."  *Id*. § 3301(b).

The Archivist's regulations adopt the FRA's definition of "records."  *See* 36 C.F.R. §§ 1222.10(a), 1222.12.  But the regulations go on to explain that not all documentary materials qualify as records.  As relevant here, the regulations specify that "[w]orking files, such as preliminary drafts and rough notes," are appropriate for preservation—and so are federal records—only in some cases.  *See* 36 C.F.R. § 1222.12(c).  First, they must be "circulated or made available to employees, other than the creator, for official purposes such as approval, comment, action, recommendation, follow-up, or to communicate with agency staff about agency business[.]"  *Id*. § 1222.12(c)(1).  *And*, second, they must "contain unique information, such as substantive annotations or comments that add[] to a proper understanding of the agency's formulation and execution of basic policies, decisions, actions, or responsibilities."  *Id*. § 1222.12(c)(2).  If the working file, draft, or notes meet both these conditions, they "must be maintained to ensure adequate and proper documentation."  *Id*. § 1222.12(c).

The FRA establishes an administrative remedy for when someone mishandles federal records by unlawfully removing or destroying the documents.  *See Armstrong v. Bush*

("*Armstrong I*"), 924 F.2d 282, 294 (D.C. Cir. 1991). The agency head must notify the Archivist of "any actual, impending, or threatened unlawful removal . . . of records in the custody of the agency, and with the assistance of the Archivist shall initiate action through the Attorney General" to recover the documents. 44 U.S.C. § 3106(a). If the agency head fails to act, the Archivist must independently request that the Attorney General initiate action. *Id.* § 3106(b).

If neither the agency head nor the Archivist seek the Attorney General's aid, private parties may sue under the APA challenging an "agency head's or Archivist's refusal to seek the initiation of an enforcement action by the Attorney General."[3] *Armstrong I*, 924 F.2d at 295.

Democracy Forward is bringing such a suit. Its motion invokes two lines of attack. First, it brings a claim under Section 706(1) to "compel agency action unlawfully withheld." Pls.' Mot. at 16 (quoting 5 U.S.C. § 706(1)). That is, it insists that the Secretary and Archivist have failed to fulfill their mandatory duty to recover Shkeyrov's notes under 44 U.S.C. § 3106. Pls.' Mot. at 11.

For the Court to compel the Secretary and Archivist to act under Section 706(1), Democracy Forward must establish that they failed to take a "precise, definite act about which they had no discretion whatever." *Norton*, 542 U.S. at 63 (cleaned up). And, indeed, Section 3106 compels such mandatory, non-discretionary action in some cases. *See* 44 U.S.C. § 3106. If the President removed a federal record and the Secretary and Archivist knew or had reason to believe this removal was unlawful, "the FRA enforcement provisions leave *no* discretion to determine which cases to pursue[.]" *Armstrong I*, 924 F.2d at 295.

Democracy Forward is also challenging the Secretary and Archivist's "decision not to initiate a recovery action" as being arbitrary, capricious, and contrary to law under Section

---

[3] Private parties may *not* directly "invoke federal courts to prevent an agency official from improperly destroying or removing records[.]" *See Armstrong I*, 924 F.2d at 294.

706(2).  Pls.' Mot. at 38.  It believes that the Secretary and Archivist incorrectly determined that Shkeyrov's notes were not federal records because they failed to consider the unique role that interpreters' notes for high-level meetings play in memorializing those meetings.[4]  *Id*. at 38–39. So Democracy Forward insists that the Secretary and Archivist failed to consider an important aspect of the problem, rendering their decision arbitrary and capricious.  *Id*. at 39.

Both Democracy Forward's Section 706(1) and 706(2) claims, though, hinge on whether Shkeyrov's notes qualify as federal records.  *See* Defs.' Mot. at 20; Pls.' Mot. at 17.  The State Department has already determined that they do not.  *See* A.R. at 6.  And—even if it can review such a determination—the Court agrees.

## B.

Democracy Forward admits that "the dispute in this case now largely boils down to one question":  whether Shkeyrov's notes are federal records.  Pls.' Mot. at 17.  In summarizing the central dispute here, Democracy Forward assumes that the Court is the appropriate decisionmaker on that issue.  But is that right?  Not according to the D.C. Circuit cases addressing the FRA's administrative remedies.

Recall that the Secretary and Archivist must notify the Attorney General when records have been unlawfully removed from the agency.  *See* 44 U.S.C. § 3106.  That is a non-discretionary obligation that courts can enforce through Section 706(1).  *See Armstrong I*, 924 F.2d at 295.  The D.C. Circuit, though, has consistently referred to an agency's decision about whether a document *qualifies* as a federal record as a matter of agency discretion.

---

[4]  As the Government notes, Democracy Forward's Section 706(2) claim really seems to challenge the State Department's decision that Shkeyrov's notes are not federal records, *not* the Secretary and Archivist's decision to forgo initiation of administrative action.  *See* Defs.' Reply at 27, ECF No. 20.  Section 3106 of the FRA doe not require the Secretary or Archivist to determine whether removed documents are federal records.  It only prescribes certain administrative actions that they must take if they know or reasonably believe that federal records have been removed from the agency.  44 U.S.C. § 3106.

For instance, in *Armstrong I*, the court assured the agency that—although the adequacy of an agency's recordkeeping guidelines was subject to judicial review—"agency personnel, not the court, will actually decide whether specific documents—whether they be scraps of paper or [digital] notes—constitute 'records' under the guidelines." 924 F.2d at 293–94; *see also id*. at 297 n.14 ("[T]he determination of whether a variety of particular documents . . . are, in fact, records must be made by agency staff on a daily basis . . . ."). And the court explained that the adequacy of an agency's guidelines and directives was "the *only* issue a court would be asked to consider . . . ." *Id.* at 294 (emphasis added). The D.C. Circuit re-affirmed this idea in *Armstrong II*, noting that the "agency undoubtedly does have some discretion to decide if a particular document satisfies the statutory definition of a record[.]" 1 F.3d at 1283.

Here, State's Agency Records Officer investigated whether the Shkeyrov's notes qualified as records. A.R. at 6. And he concluded that "any written material generated by the LS/I interpreter in the course of providing oral interpretation during the meeting between President Trump and President of the Russian Federation Putin in Hamburg, Germany, on July 7, 2017 was not a federal record." *Id.* Since the agency never designated the interpreter's notes as a federal record, the Secretary and Archivist never had reason to believe that the President removed a federal record. *Id.* Their duties under Section 3106 were never triggered. This should end the matter.

## C.

But even if the Court does have a role in deciding whether these particular notes were federal records, the Court agrees with the agency's determination. These notes were not records.

Democracy Forward suggests that these notes qualify as records because they contain "informational value." Pls.' Mot. at 18. It insists that this standard is "satisfied by notes

containing only discrete information tending to show such contextual details as the date or time of a meeting, or the names or titles of attendees or broad subjects discussed." *Id*. (citing *Armstrong II*, 1 F.3d at 1284).[5]

Yet that interpretation of the definition of "record" omits key language from the statute. Congress did not say that any "recorded information" that has "informational value" is a record. It stated that a document is a federal record when it is "*preserved or appropriate for preservation . . . because of the informational value of data in [it]*." 44 U.S.C. § 3301(a)(1)(A) (emphasis added).

NARA has determined that certain "working files" such as preliminary drafts, rough notes, and similar documents—which undoubtedly contain *some* data with informational value— are still not appropriate for preservation. 36 C.F.R. § 1222.12(c); *see Armstrong II*, 1 F.3d at 1287 ("Not all scribbles and off-the-cuff comments will qualify as federal records."). If these working files either lack unique information or are not "circulated or made available to employees, other than the creator, for official purposes," they are not records. 36 C.F.R. § 1222.12(c). Here, the Government claims that Shkeyrov's notes are working files that do not meet the criteria for records under NARA's regulation. Defs.' Mot. at 19–20.

---

[5] Democracy Forward misreads *Armstrong II*. It insists that in *Armstrong II*, the D.C. Circuit established that a document is "appropriate for preservation" if it contains even trace amounts of information—such as metadata. *See* Pls.' Mot. at 18; Pls.' Reply at 15–17, ECF No. 22. But the part of the opinion Democracy Forward pulls this from was not about whether the electronic files at issue there qualified as federal records. It was undisputed that those documents were federal records. *Armstrong II*, 1 F.3d at 1282. Rather, the court considered whether, once those electronic documents were designated as federal records, they could later shed that label if the agency created paper copies. *Id*. at 1284–85. Under the FRA, they could only do so if the electronic documents were "extra copies of documents." *See id*. at 1284; 44 U.S.C. § 3301(a)(B)(ii). Since the digital files contained metadata not reflected in the paper versions, the paper versions were not "identical" copies under FRA. *Id*. at 1286. So the agency could not dispose of the digital records without following the agency's and NARA's guidelines. *Id*. The court never held that a file that consisted of metadata alone would constitute a federal record. *See id*. at 1287 ("Our decision does not require that agencies . . . save 'every scrap of paper' they create.").

Democracy Forward never challenges Section 1222.12(c).  *See* Defs.' Reply at 21, ECF No. 20.  It merely suggests that the regulation either does not apply to Shkeyrov's notes at all or that, if it does, the notes would meet the regulation's qualifications for federal records.  Pls.' Mot. at 24.  The Court takes each argument in turn.

First, Democracy Forward suggests that the "working files" category does not apply when rough notes are "the *only* writing describing a government activity."  *Id*.  In other words, the "working files" regulation does not categorize these documents as "records" because it "assumes a final product that itself constitutes a federal record and adequately documents the relevant government activity[.]"  *Id*.  But, as the Government notes, this argument finds no support in the text of regulation.[6]  *See* Defs.' Reply at 20–21.

To be sure, some working files identified by NARA—such as "preliminary drafts"—may have a final product designated as a federal record.  But the regulation also identifies "rough notes" and "other similar materials" as working files.  36 C.F.R. § 1222.12(c).  And it categorizes these documents as records *only if* they meet two conditions—neither of which provide that a document is a record if it is "the *only* writing describing a government activity."  *See* Pls.' Mot. at 24; 36 C.F.R. § 1222.12(c).

Democracy Forward next contends that even if the "working files" regulation applies, Shkeyrov's notes meet both prerequisites to qualify as federal records.  Pls.' Mot. at 24–25.  It insists that an interpreter's notes for a meeting between heads of state would have contained

---

[6] Indeed, Democracy Forward does not even cite—much less quote—the regulation for this proposition.  *See* Pls.' Mot. at 24.  Instead, it cites NARA's record management schedule guidance which notes that "working files used in preparing reports or studies and preliminary drafts of policy documents circulated for comment" are likely federal records.  *Id*. (citing NARA, Identification of Records, Nonrecord Materials, and Personal Papers, available at https://www.archives.gov/records-mgmt/scheduling/id).  This certainly does not mean that *all* working files are records unless they have a final product designated as a federal record.  It merely affirms what the regulation says: working files qualify as federal records when they contain unique information and are "circulated or made available to employees, other than the creator, for official purposes."  36 C.F.R. § 1222.12(c).

unique, substantive information about the proceedings that would "add[] to a proper understanding of government action." *Id.* at 25.  And, it believes, the interpreter would have circulated these notes or made them available to other Department employees if the President had not seized them.  *Id.* at 22–24 & n.5.

As the Government explains, though, these arguments are belied by the record.  First, State Department interpreters' notes do not "contain unique information, such as substantive annotations or comments that add[] to a proper understanding of the agency's formulation and execution of basic policies, decisions, actions, or responsibilities." *See* 36 C.F.R. § 1222.12(c)(2).  The Government submitted a declaration from the Chief of the Interpreting Division in the State Department's Office of Language Services ("LS/I") explaining that Department interpreters' notes do not have substantive annotations.  A.R. at 14–15.  These notes generally contain "writings, which are often scribbled without order, using the interpreter's own shorthand abbreviations or symbols, across the interpreter's notebook" that "serve solely as a short-term memory aid." *Id.* at 15.  Not surprisingly, the interpreters "do not, and could not, take summary written notes." *Id.*  And this is the case "regardless of the level of meeting for which services are being provided[.]" *Id.* at 13.  The Government also certified that Shkeyrov's notes conformed to this format. *Id.* at 16.

Even assuming, though, that Shkeyrov's notes did contain some unique, substantive information, the Government confirmed that interpreters' notes in general—and these interpreter's notes specifically—are not and would not be "circulated or made available to employees . . . for official purposes." *See* 36 C.F.R. § 1222.12(c)(1).  According to the Chief of LS/I, "the role of an LS/I interpreter does not include generating written documentation of a meeting."  A.R. at 15.  LS/I does not "maintain[] records regarding the content of meetings in

12

which LS/I employees serve as interpreters." *Id.* at 16.  It "does not review or retain copies of any written 'notes' of interpreters" or "instruct its interpreters to follow any protocol with respect to the creation or disposition of such written material." *Id.*  Interpreters' notes "are never circulated within LS, or elsewhere within the Department, nor have they otherwise been made available for any official purpose." *Id.*  And the Government also certified that Shkeyrov's notes conformed to these general rules. *Id.*

Based on this administrative record, the records cannot qualify as "working files" that are federal records because they meet neither condition prescribed in 36 C.F.R. § 1222.12(c).

## D.

Still, Democracy Forward protests that the administrative record fails to tell the full story. So it has attached its own exhibits to its Motion for Summary Judgment—a declaration from a former Director of LS/I, Harry Obst, and two *Washington Post* articles.  *See* Pls.' Mot., Ex. B ("Obst Decl."); Miller Article; Baker Article.  These exhibits, it suggests, show that though interpreters' notes may not *generally* contain substantive content and be circulated to other agency officials, Shkeyrov's notes would constitute records. Pls.' Mot. at 15.  This is because, "in the context of such head-of-state meetings, interpreter notes are critical to ensuring that these important and sensitive discussions are fully documented for use by administration officials and, eventually, examiners of the historical record." *Id.* at 9.

The Government objects to admission of Democracy Forward's exhibits.  Defs.' Reply at 9–15.  It believes it is inappropriate for the Court to consider extra-record evidence here, *id.* at 9–11, and it protests that these exhibits contain hearsay or are irrelevant, *id.* at 11.  But, in an abundance of caution, it has submitted its own supplemental declarations rebutting Democracy Forward's evidence.  *See* Defs.' Reply at 14; Defs.' Reply, Ex. 1–3, ECF Nos. 21-1 to 12-3.

So what—if any—extra-record evidence should the Court consider? Ordinarily in APA cases, a court reviews only the administrative record. *See Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). The administrative record generally "consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *See Lee Mem'l Hosp. v. Burwell*, 109 F. Supp. 3d 40, 46 (D.D.C. 2015) (internal quotation omitted). Since a district court sits as an "appellate tribunal" reviewing the "entire case . . . [as] a question of law," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), the "focal point for judicial review [is] the administrative record already in existence, not some new record made initially in the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (quoting *Camp* v. *Pitts*, 411 U.S. 138, 142 (1973)).

But, as with many rules, there are exceptions. *See Esch v. Yeutter*, 876 F.2d 976, 991 & n.166 (D.C. Cir. 1989) (compiling exceptions). For instance, courts may turn to extra-record evidence "where agencies are sued [under § 706(1)] for a failure to take action." *Id*. In these cases, review cannot be "limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *Nat'l Law Ctr. on Homelessness & Poverty ("NLCHP") v. U.S. Veterans Admin.*, 842 F. Supp. 2d 127, 130–31 (D.D.C. 2012) (quoting *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000)).

This exception is directly on point—at least for one of Democracy Forward's claims. The Organizations are suing the Secretary and Archivist, in part, for failure to act. *See* Pls.' Mot. at 16–17. Because the Government believes there has been no final agency action, it admits that there are "no written documents reflecting [the agency's] consideration or decision" on whether

to act under 44 U.S.C. § 3106.  Defs.' Mot. at 12.  Thus, it has crafted an administrative record

from agency personnel's declarations to "provide background information and information

necessary to understand the agencies' contemporaneous reasons for not taking action."  *Id*. at 13.

It insists that these records are "sufficient to allow for judicial review."  Defs.' Reply at 11.

Perhaps so, but Democracy Forward may also be entitled to present evidence that the

Secretary and Archivist's inaction is unreasonable or unlawful.  Indeed, judges in this District

have often held that in Section 706(1) suits, plaintiffs are "entitle[d] . . . to rely upon material that

is outside the scope of the administrative record."  *Nio v. DHS*, 314 F. Supp. 3d 238, 242 (D.D.C.

2018); *see also W. Watersheds Project v. Pool*, 942 F. Supp. 2d 93, 100 (D.D.C. 2013)

("Because this case is about agency inaction . . . rather than agency action, this case may not be

resolved solely based on the administrative record.").

The Government cites no law to the contrary.  *See* Defs.' Reply at 11 (recognizing that

courts do not limit review to the administrative record for Section 706(1) claims, but claiming

that "the records submitted by Defendants here are sufficient to allow for judicial review").  The

Court may, then, consider extra-record evidence for Democracy Forward's 706(1) claim.

Whether the Court should admit this evidence to support Democracy Forward's Section

706(2) claim, though, is a separate question.  A claim under Section 706(2) is a challenge to a

final agency action.  And "in a challenge to final agency action, judicial review is ordinarily

limited to the administrative record in existence at the time of the agency's decision."  *NLCHP*,

842 F. Supp. 2d at 130.

Courts may only consider extra-record evidence in these cases when "(1) the agency

deliberately or negligently excluded documents that may have been adverse to its decision; (2)

the district court needed to supplement the record with 'background information' in order to

determine whether the agency considered all of the relevant factors; or (3) the agency failed to explain administrative action so as to frustrate judicial review." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (cleaned up).  These exceptions are "quite narrow and rarely invoked." *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014).  They are mainly limited to cases in which "the procedural validity of the agency's action remains in serious question" or "where the administrative record itself is so deficient as to preclude effective review." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (cleaned up).

Democracy Forward suggests that its exhibits qualify as "background information" showing that the Secretary and Archivist failed to consider that interpreters play a documentary role in high-level meetings between heads of state.  Pls.' Mot. at 15 n.1.  Given the questionable relevancy of the evidence, discussed below, the Court doubts that it "needs" this information to evaluate Democracy Forward's claim.  *See Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000) (noting that "exceptions to the general rule against extra-record evidence are based upon necessity, rather than convenience, and should be triggered only where the omission of extra-record evidence precludes effective judicial review").  It therefore would be inappropriate for the Court to consider this extra-record evidence for Democracy Forward's Section 706(2) claim.

But even if it were appropriate for the Court to consider extra-record evidence for both of Democracy Forward's claims, this evidence must clear a second hurdle:  admissibility. Defendants object that Democracy Forward's exhibits are inadmissible for both claims because the newspaper articles contain hearsay and the Obst declaration is irrelevant.  Defs.' Reply at 11. Democracy Forward, though, retorts that there is no hearsay rule in APA cases.  *See* Pls.' Reply at 11, ECF No. 22.

Hearsay evidence certainly may be included as part of the *administrative record*, *see Kadi v. Geithner*, 42 F. Supp. 3d 1, 12 (D.D.C. 2012), because the record "is what it is," *NRDC v. Zinke*, 347 F. Supp. 3d 465, 495 (E.D. Cal. 2018) (internal quotations omitted). If the agency relied "on unreliable evidence, then that could and should be considered by the reviewing court in making a determination as to whether the APA has been violated." *NRDC*, 347 F. Supp. 3d at 495 (cleaned up).

 Courts, though, have applied the Federal Rules of Evidence to another party's *extra-record* evidence. *See, e.g.*, *Glob. Comput. Enters. v. United States*, 88 Fed. Cl. 52, 69 (2009) (considering whether extra-record evidence in an APA case contained hearsay); *cf. Humane Soc'y of U.S. v. Animal & Plant Health Inspect. Serv.*, 386 F. Supp. 3d 34, 44 (D.D.C. 2019) ("[C]ourts may consider hearsay in FOIA cases when assessing the adequacy of the agency's search. . . . But it is a different matter to rely on out-of-court statements from private third-parties to justify an agency's withholding.").

Here, under the rules of evidence, Democracy Forward's extra-record evidence is inadmissible for both its Section 706(1) and Section 706(2) claims. Democracy Forward relies on the *Washington Post* articles for the truth of the matter asserted, *see, e.g.*, Pls.' Mot. at 24 n.5, but courts have routinely held that "newspaper articles constitute inadmissible hearsay" because they "usually provide no evidence of the reporter's perception, memory or sincerity," *Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005) (cleaned up).

The Obst Declaration also has questionable relevance. *See* Fed. R. Evid. R. 402 ("Irrelevant evidence is not admissible."). It speaks only to "how certain interpreter notes may have been used before 1997," but is "not relevant to whether the Secretary or the Archivist had

an obligation to recover interpreter notes created twenty years later[.]" Defs.' Reply at 13.  The Court therefore finds Democracy Forward's exhibits inadmissible.

But even if the Court were to consider Democracy Forward's extra-record evidence and the Government's supplemental rebuttal evidence, it would make no difference.

The newspaper articles—even if taken as true—do not establish that Shkeyrov's notes were federal records.  Democracy Forward offers them as evidence that "top national security officials were actively seeking out information" about the meeting and that "any recorded information—even 'jottings'—would have been welcome to these officials."[7] *See* Pls.' Reply at 15 n.6.  It speculates that these notes would have contained some helpful information shedding light on the contents of the meeting.  *See id*. at 19.  Perhaps.  But the articles say nothing about the actual contents of the notes.  And—even if they suggest that the notes may have been circulated if preserved—they certainly do not prove that the notes contained unique, substantive information about the proceedings.

Rather, Democracy Forward's strongest piece of evidence is a declaration from Harry Obst, who served as a diplomatic interpreter from 1965 through 1997 and as the Director for LS/I from 1984 to 1997.  Obst Decl. ¶ 2.  He claims to have periodically served as an interpreter for the State Department on a contract-basis since then, *id*. ¶ 5, though the Government's records show that since 2000 he has only provided interpretive services for the State Department once, in 2014, *see* Lee Suppl. Decl. ¶ 2, ECF No. 20-1.

---

[7] Democracy Forward appears to primarily seek admission of the articles to show that the Secretary "knew or had reason to believe" that the President unlawfully removed records from the Department, since the articles are the only evidence that (1) the President took Shkeyrov's notes, and (2) Secretary Tillerson was present at the meeting.  *See, e.g.*, Pls.' Mot. at 29; Pls.' Reply at 21.  Since these notes were not federal records, the Court never reaches the question of whether the Secretary was aware of their removal.

Obst's declaration claims that while he was at the State Department an interpreter's role changed based on type of meeting he was interpreting.  Obst Decl. ¶¶ 15–16.  When he interpreted for a meeting between high-level officials, such as the President, he would prepare or help prepare a "Memorandum of Conversation" ("MemCon") following the meeting to "memorialize the discussion."  *Id*. ¶¶ 9, 16.  The MemCom "would include such details as the date of the meeting; start time and end time; attendance list . . . [and] would describe the exchanges between the participants . . . captur[ing] all of the substance discussed by the parties."  *Id*. ¶ 10.  Interpreters relied "principally on their interpreter notes to refresh their memory of the contents of the exchange."  *Id.* ¶ 13.  The interpreters would then submit the MemCon to the Executive Secretary in the Office of the Secretary of State.  *Id*. ¶ 14.

Democracy Forward says that the Obst declaration establishes that—although the administrative record described general practice for interpreters[8]—an interpreter for a meeting with the President would have taken substantive notes that he would circulate to other agency officials and use to create a MemCon.  *See* Pls.' Mot. at 25.

There's a flaw in this logic.  Obst's declaration describes practices and policies followed by the State Department more than two decades ago.  Much has changed at the State Department since Obst completed his service there.

Consider:  In 1997—the year that Obst retired—the Department's library was offering employees weekly briefings and live demonstrations of an emerging new technology:  "the Internet."  *See* Dan Clemmer, *Resources are on the Shelf, Online, Cassette*, U.S. Department of

---

[8]  Democracy Forward asserts that the Government ignores "an important distinction between routine OLS interpreting missions and missions involving the President or other high-level officials and fails to appreciate the importance of interpreter notes in documenting these high-level meetings."  Pls.' Mot. at 22.  Not so.  The administrative record reflects that interpreters follow the practices described in the record "regardless of the level of meeting for which services are being provided[.]"  A.R. at 13.

State Archive (Mar. 1997), https://1997-2001.state.gov/publications/statemag/statemag_march/library.html.  The Department distributed anti-virus software to employees on floppy disks.  *See* Teddy R. Payne, *State Hosts Anti-Virus Software Giveaway*, U.S. Department of State Archive (Mar. 1998), https://1997-2001.state.gov/publications/statemag/statemag_march98/news.html. And a State Department IT Officer won an award for setting up "a twice-daily dial-up e-mail operation" linking Vietnam with Washington, D.C.  *See* U.S. Dep't of State, *Carl Giampietro Wins Information Management Honors*, U.S. Department of State Archive (Aug. 1996), https://1997-2001.state.gov/publications/statemag/statemag_nov-dec/statemag_aug/ha.htm. Even for the federal government these events would be archaic today.

Unsurprisingly, the State Department notes that its policies have changed in the last twenty years.  *See* Lee Suppl. Decl. ¶ 5; Ronkin Decl. ¶¶ 3, 5, ECF No. 20-2; Shkeyrov Decl. ¶ 6, ECF No. 20-3. [9]   According to the current chief interpreter, today's LS/I interpreters—no matter if the meeting is low-level or otherwise—"do not have a duty to help construct or confirm the accuracy of a MemCon, nor as a matter of practice do they have any responsibility or role in the creation of documents memorializing a meeting."  Lee Suppl. Decl. ¶ 6.

And even if the State Department had not changed its policies and interpreters' notes *generally* conformed to Obst's description, the Government has submitted a declaration from the Hamburg meeting interpreter, Yuri Shkeyrov, explaining that his notes from that meeting did not fit Obst's description.  *See* Shkeyrov Decl. ¶¶ 5–6.  Shkeyrov explains that, when interpreting,

---

[9]  Though the Government is not seeking to supplement the administrative record, it does ask the Court to consider its supplemental declarations "if the Court considers Mr. Obst's declaration when evaluating the merits of Plaintiffs' claims."  Defs.' Reply at 14 n.3.  For the Court to consider the Government's declarations, these documents must also meet the threshold for supplementing the administrative record or for admitting extra-record evidence.  *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010).  If the Court were to admit the Obst declaration as "background information [] needed to determine whether the agency considered all the relevant factors," *id.* (cleaned up), then the Government's declarations rebutting Obst's assertions also provide needed background information to assure the Court that the agency did indeed consider all factors.

his "methodology with respect to written notes includes quickly jotting down a word, number, symbol, or some other scribbled-down figure that would be comprehensible only to [himself]." *Id*. ¶ 4.  He does "not organize these jottings in any particular manner, as there is no need to refer to a 'note' or understand its context once a particular set of remarks has been interpreted." *Id*. Nor does he mark his notes "with any title or label or date that identifies the meeting or the participants." *Id*.

His notes for the Hamburg meeting conformed to this description. *Id.* ¶ 5.  Indeed, he testifies that his notes did not "make a record of what happened at the meeting" and he does "not believe it would be possible for someone else to accurately reconstruct what happened at that meeting or what was discussed from the jottings that [he] made in the course of interpreting." *Id*.

More, he never received a request from anyone in the State Department that he circulate his notes from the Hamburg meeting. *Id*.  And no one ever asked him to prepare or help draft a MemCon for that meeting. *Id*. ¶¶ 5–6.  In fact, he attests that he has "no first-hand knowledge" of interpreters helping draft MemCons and that interpreters "certainly" did not play this role "by 1998 or 1999, when [he] first started being assigned to interpret for Presidential-level meetings, and [it] certainly was not the practice in July 2017." *Id*. ¶ 6.

These rebuttal declarations thus establish three important facts.  First, contrary to Democracy Forward's suggestion, the MemCon practices described in the Obst declaration are now obsolete.  *See* Lee Suppl. Decl. ¶ 5; Ronkin Decl. ¶¶ 3, 5; Shkeyrov Decl. ¶ 6.  Second, Shkeyrov's notes from the Hamburg meeting lacked substantive information that someone could use to document or reconstruct the meeting.  Shkeyrov Decl. ¶¶ 4–5.  And third, even if the President had not taken the notes, Shkeyrov would not have used them to create a report or have circulated them to other agency officials.  Shkeyrov Decl. ¶¶ 5–6.

So even if the Court were to consider the Obst declaration or the newspaper articles Democracy Forward submitted, the supplemental declarations provided by the Government conclusively place these "rough notes" outside the bounds of working files that are federal records under 36 C.F.R. § 1222.12(c).

### E.

Whether the Court takes the agency at its word, performs its own analysis relying only on the administrative record, or takes Democracy Forward's extra-record evidence into account, the result is the same:  Shkeyrov's notes are not federal records.  And, since they are not federal records, both Democracy Forward's Section 706(1) and 706(2) claims must fail.

The Secretary's duty to pursue administrative action is triggered only when he "knows or has reason to believe [records] have been unlawfully removed from that agency."  44 U.S.C. § 3106(a).  Likewise, the Archivist's duty to act is triggered only when the Secretary has failed to act when records are unlawfully removed from the agency.  *Id*. § 3106(b).  Since the President did not remove records from the agency, neither the Secretary nor the Archivist had a duty to act.

The Secretary and Archivist also did not act arbitrarily and capriciously by declining to institute an action to recover Shkeyrov's notes.[10]  They did not "fail[] to consider that an interpreter's notes for meetings between high-level government officials are different than for run-of-the-mill, routine interpreting missions[.]"  Pls.' Mot. at 38–39.  In fact, the administrative record reflects that the Government *did* consider whether an interpreter's role differs based on the level of meeting and that the Government concluded it was not.  A.R. at 13.  And the

---

[10]  The Government argues that Democracy Forward cannot even raise a claim under Section 706(2) because neither the Secretary nor Archivist made a final decision not to act under Section 3106.  Defs.' Mot. at 24.  The Court need not address this argument because, even if this were a final agency action, the Secretary and Archivist did not act arbitrarily, capriciously, or in violation of law.

Government's supplemental declarations confirm that.  *See* Lee Suppl. Decl. ¶ 5; Ronkin Decl.
¶ 3; Shkeyrov Decl. ¶ 3.

Shkeyrov's notes from the July 2017 Hamburg meeting simply are not federal records.
So the Secretary and Archivist need not recover them.

## IV.

It is said that "Till heaven and earth pass, one jot or one tittle shall in no wise pass from
the law, till all be fulfilled."  Matthew 5:18 (KJV).  Perhaps the same is true of federal records.
But an interpreter's jottings are neither law nor record, and pass they shall.  The Defendants'
Motion for Summary Judgment will be granted and Democracy Forward and American
Oversight's Cross-Motion will be denied.  A separate Order will issue.


Dated:  July 23, 2020                                TREVOR N. McFADDEN, U.S.D.J.